AF Approval **AO FOR** _JMH_                    Chief Approval _____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 5:25-cr-44-TPB-PRL

FRANK ADRIEL ROMERO LEANDRO

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Gregory W. Kehoe, United States Attorney for the Middle District of Florida,

and the defendant, Frank Adriel Romero Leandro, and the attorney for the

defendant, Christine N. Bird, Esq., mutually agree as follows:

**A.     Particularized Terms**

1.     Count Pleading To

The defendant shall enter a plea of guilty to Count One of the

indictment.  Count One charges the defendant with wire fraud, in violation of

18 U.S.C. § 1343.

2.     Maximum Penalties

Count One carries a maximum sentence of 20 years'

imprisonment, a fine of $250,000, or twice the gross gain caused by the

offense, or twice the gross loss caused by the offense, whichever is greater, a

term of supervised release of not more than 3 years, and a special assessment

Defendant's Initials _____ fr

of $100.  With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.    Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count One are:

First:    The Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;

Second:    the false pretenses, representations, or promises were about a material fact;

Third:    the Defendant acted with the intent to defraud; and

Fourth:    the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

Defendant's Initials ___fr___                    2

4.  Count Dismissed

At the time of sentencing, the remaining count against the defendant, Count Two, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.  No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.  Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to the victims of this offense through the Federal Trade Commission.

7.  Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a).  The defendant understands that

Defendant's Initials ___fr___          3

this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.    Low End

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a sentence at the low end of the applicable guideline range, as calculated by the

Defendant's Initials ____fr____                    4

Court. The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

This recommendation by the United States is conditioned on the defendant mailing full restitution to the victims through the Federal Trade Commission in advance of the sentencing date.

9.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $1,234,360.46 in proceeds the defendant admits he obtained, as the result of the commission of the offenses to which the defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of the offenses, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred, sold to, or deposited with a third party, and are unavailable for forfeiture. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property

Defendant's Initials ___fr___                    5

of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offenses of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offenses and consents to the entry of the forfeiture order into the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred, sold to, or deposited with a third party, and are unavailable for forfeiture, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein

Defendant's Initials ____fr____                    6

constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after

Defendant's Initials ___fr___          7

sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Defendant's Initials ___fr___                8

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

## B.   **Standard Terms and Conditions**

### 1.   Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing

Defendant's Initials ___fr___               9

other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2.    Supervised Release

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

Defendant's Initials ___fr___                10

4.   Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.   Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United

Defendant's Initials ___fr___                          11

States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States

Defendant's Initials ___fr___                12

Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

      7.     Defendant's Waiver of Right to Appeal the Sentence

      The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to

Defendant's Initials ____fr____         13

appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges

Defendant's Initials _____fr_____                    14

defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

Defendant's Initials ___fr___                    15

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.   Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___6___ day of May 2026.

GREGORY W. KEHOE
United States Attorney

_____
Frank Adriel Romero Leandro
Defendant

_____
Hannah Watson
Assistant United States Attorney

Christine Bird    Digitally signed by Christine Bird
_____
Christine N. Bird, Esq.    Date: 2026.05.05
Attorney for Defendant    21:29:25 -04'00'

_____
Robert E. Bodnar, Jr.
Assistant United States Attorney
Chief, Ocala Division

Defendant's Initials ___fr___                    17

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 5:25-cr-44-TPB-PRL

FRANK ADRIEL ROMERO LEANDRO

PERSONALIZATION OF ELEMENTS

Do you admit that between March 16, 2020, through February 10, 2021, in the Middle District of Florida, you knowingly devised a scheme to defraud by using false and fraudulent pretenses, representations, and promises regarding the sale facemasks during the COVID-19 global pandemic?

Do you admit that it was part of your scheme that you were the sole creator and editor of a website, trendeploy.com, through which you sold goods under the business name, "Trend Deploy"?

Do you admit that it was part of your scheme that you made false representations on your website that you sold N95 facemasks to customers?

Do you admit that it was part of your scheme that customers would order N95 facemasks from you?

Do you admit that it was part of your scheme that you would purchase different types of facemasks (not N95 facemasks) to fulfill your customers' orders?

Defendant's Initials _____fr_____                18

Do you admit that it was part of your scheme that you did not provide your customers with the N95 facemasks they ordered?

Do you admit that these false pretenses, representations, and promises were about material facts?

Do you admit that you acted with the intent to defraud?

Do you admit that you caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud? Specifically, you caused the March 21, 2020, electronic wire transfer in the amount of $59.98 from Bank of America credit card ending in 1774 to Trend Deploy?

Defendant's Initials ____fr____                    19

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                                  CASE NO. 5:25-cr-44-TPB-PRL

FRANK ADRIEL ROMERO LEANDRO

FACTUAL BASIS

Frank Adriel Romero Leandro is a Middle District of Florida resident who lives in Ocala, Florida. During the COVID-19 pandemic, Romero sold facemasks throughout the United States under the business name, "Trend Deploy." Romero falsely claimed that he sold N95 facemasks, which are certain medical-grade facemasks that were regulated by the Centers for Disease Control and Prevention ("CDC"). However, the representations Romero made about the facemasks he sold were false. In almost every case, he did not sell N95 facemasks, as he claimed.

When a customer would purchase an "N95" facemask from Romero through the Trend Deploy website, Romero would buy generic facemasks from wholesale dealers to fulfill the order. In over 95% of the consumer orders submitted for N95 masks, Romero ordered something other than an N95 mask. Customers would email their complaints to Romero, telling him that the facemasks they received were not N95. In response, Romero would either

Defendant's Initials ___fr___                          20

ignore their complaints and requests for refunds or he would try to convince the customer that the facemasks were N95 by providing them with a fake certificate purporting to be from the CDC National Institute for Occupational Safety and Health ("NIOSH").  In at least ten cases, customers informed Romero the certificate was fraudulent.

Despite multiple complaints from customers and requests for refunds, Romero continued to make false representations regarding the masks he sold. Between March 16, 2020, through February 10, 2021, Romero sold 12,785 facemasks he falsely claimed were N95, and he fraudulently obtained a total of $1,234,360.46 from the sales.

<u>COVID-19 and the Defense Production Act</u>

On January 31, 2020, the Secretary of Health and Human Services declared a national public health emergency under 42 U.S.C. § 247d due to the spread of COVID-19, which was a highly contagious, severely acute respiratory syndrome in the United States.  On March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic.

On March 13, 2020, the President of the United States issued Proclamation 9994 declaring a national emergency due to the rapid spread of COVID-19 within the United States.  On March 18, 2020, the President issued Executive Order 13909 invoking the powers vested in the President by the

Defendant's Initials ___fr___                    21

Defense Production Act of 1950. In Executive Order 13909, the President stated, "I find that health and medical resources needed to respond to the spread of COVID–19, including personal protective equipment and ventilators, meet the criteria specified in section 101(b) of the [Defense Production Act.]" The President further delegated authority to the Secretary of Health and Human Services to "identify additional specific health and medical resources that meet the criteria of section 101(b)."

On March 23, 2020, the President issued Executive Order 13910 delegating to the Secretary of Health and Human Services the President's authority under 50 U.S.C. § 4512 "to prevent hoarding of health and medical resources necessary to respond to the spread of COVID-19 within the United States," and "to implement any restrictions on hoarding."

On March 30, 2020, the Secretary of Health and Human Services published a notice designating the following health and medical resources, among others, under the Defense Production Act as scarce materials or materials the supply of which would be threatened by accumulation in excess of reasonable demands of business, personal, or home consumption, or for the purpose of resale at prices in excess of prevailing market prices:

1. N-95 Filtering Facepiece Respirators, including devices that are disposable half-face-piece non-powered air-purifying particulate

Defendant's Initials __fr__          22

respirators intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates;

2. Other Filtering Facepiece Respirators (e.g., those designated as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory protective devices that cover the user's airway (nose and mouth) and offer protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181;

3. Elastomeric, air-purifying respirators and appropriate particulate filters/cartridges; and

4. PPE surgical masks, including masks that cover the user's nose and mouth and provide a physical barrier to fluids and particulate materials.

Trend Deploy

Romero sold goods throughout the United State under the business name, "Trend Deploy," through his website, trendeploy.com. Romero was the sole creator and editor of this website. He operated it primarily from the Middle District of Florida where he resided. Romero had two employees who worked as independent contractors, P.M. and S.R. The independent

Defendant's Initials ____fr____                    23

contractors had customer service responsibilities, and they reported to Romero.

Romero's business model consisted of promoting products in social media ads, which redirected customers to his trendeploy.com store website. The customers then made purchases online through his website. Romero did not keep an inventory of products. He sent orders to wholesale distributors who then shipped the products to his customers.

To add products to his online store, Romero used Shopify[1] and two other ecommerce platforms. The platforms allowed him to access wholesale distributors. When Romero selected a product from a distributor, he imported the product's pictures and description to his Trend Deploy website. Romero could add and delete any picture and description to a product's page. Romero was the only person involved in the publication process for products he sold on Trend Deploy's website.

Romero's customers would place orders on the Trend Deploy website, and Romero would submit the orders to his wholesale distributors. When

---

[1] Shopify is a Canadian multinational e-commerce company headquartered in Ottawa, Ontario. E-commerce, or electronic commerce, is the buying and selling of products and services online. Shopify is the name of its proprietary e-commerce platform for online stores and retail point-of-sale systems. The platform offers retailers services, including payments, marketing, shipping and customer engagement tools.

Defendant's Initials ___fr___          24

Romero sent an order list to his distributors, they would return it to him with the wholesale prices he must pay.  After Romero paid the distributor, the distributor would ship the products to Romero's customers and provide him the shipment's tracking number.

Romero's false representations

On March 13, 2020, which was the same day the President issued Proclamation 9994 declaring COVID-19 a national emergency, Romero began marketing facemasks on his Trend Deploy website.  G.B. and A.C., both located in China, were two of Romero's facemask distributors. Romero has never met any of his distributors in person.

Romero advertised through social media and listings on his Trend Deploy website that he was selling "N95" masks.[2]

The designation of "N95" is significant.  The CDC NIOSH regulates N95 respirators.  Surgical N95 respirators for healthcare settings are regulated by the United States Food and Drug Administration ("FDA").  The CDC website provides a listing of NIOSH-approved particulate filtering facepiece respirators.  This type of air-purifying respirators protects by filtering particles out of the air the user is breathing.  There are seven classes of filters for

---

[2] Romero also described the facemasks as "Class N95" and "KN95."  Romero claimed these masks had the same filtration efficiency as N95 facemasks.

Defendant's Initials ___fr___                25

NIOSH-approved filtering facepiece respirators available.  An N95 respirator is a respiratory protective device designed to achieve a very close facial fit and very efficient filtration of airborne particles.  The edges of the respirator are designed to form a seal around the nose and mouth.  The minimal level of filtration that will be approved by NIOSH is 95%, as required by 42 CFR Part



84.

*Screenshot from the Trend Deploy website advertising genuine N95 masks.*

Defendant's Initials ___fr___            26



*Screenshot from the Trend Deploy website advertising genuine N95 masks.*



*Screenshot from the Trend Deploy website selling "N95" masks.*

On his Trend Deploy website, Romero represented that he would deliver N95 respirators and masks certified by the National Institute for Occupational Safety and Health ("NIOSH"). Romero informed consumers that his "N95" facemasks were certified by NIOSH.

Defendant's Initials ____fr____                28

Despite his advertising, he almost never provided an "N95" mask to a customer. Romero's customers ordered "N95" masks and filters, but Romero did not purchase "N95" masks or filters from wholesale distributors. Instead, Romero purchased different and inferior types of masks and filters from wholesale distributors to fill the orders.

Romero received 10,853 orders for "N95" masks, and he purchased 7,277 "PM 2.5" masks and 3,576 "reusable face masks" from wholesale distributors to fulfill those orders. Romero received 2,731 orders for "N95 micro-particle barrier double filters," and he purchased 1,500 "filters" and 1,231 "PM2.5" filters to fulfill those orders. Romero knew that he was not providing the advertised products to his Trend Deploy customers because he was not ordering the advertised products to fulfill their order requests.



*An example of the masks a customer received when she ordered "N95" masks from Romero. This customer worked at a hospital and needed N95 masks to work. Instead, she received cloth masks that do not have the protections of the N95 masks.*

Defendant's Initials ___fr___                29



*An example of the mask a customer received when they ordered an N95 mask from Romero.*

Due to the significance of the "N95" designation, customers contacted Romero to confirm that the facemasks were, in fact, N95 facemasks. On March 16, 2020, a customer, S.F., contacted Romero through the Trend Deploy email address stating the following:

> *I just purchased the reusable cloth masks with N95 filter. Who is the manufacturer? I would like to verify they are on the list from the CDC list of certified n95 manufacturers.*

On March 18, 2020, a customer, H.S., contacted Romero through the Trend Deploy email address stating the following:

> *I ordered these masks but I cannot find your approval on the cdc site. Please send me a way to verify that you are NIOSH approved or cancel my order.*

Defendant's Initials ___fr___          30

Romero responded to H.S.'s email with an attachment of a purported NIOSH certificate stating:

> *Here's a digital copy of our manufacturer's N95 Certification along with the NPPTL Info for verification purposes. For additional info, please kindly email us at any time. Thank you.*

NIOSH did not issue the certificate Romero sent to H.S. There are only seven different NIOSH testing certification codes for respirators. NIOSH has never used the testing code that is listed in Romero's purported N95 certificate. NIOSH has also never used the task numbers listed in it. Anyone can go on the CDC website to look up NIOSH reference numbers and approval numbers.

Romero sent the same fake NIOSH certificate to 16 customers who asked him for verification that the facemasks he sold were N95 facemasks. The fake NIOSH certificate was also on the Trend Deploy website. Romero's customers explained to Romero that the CDC's website maintains a list of NIOSH-approved filters, and his certificate is fake.

Despite Romero having notice that his representations on the Trend Deploy website and in emailed exchanges were false, Romero continued selling facemasks under the false representations that they were N95

Defendant's Initials ___*fr*___                    31

facemasks.[3] The last date that Romero sold a purported "N95" mask was on February 10, 2021. Through his false representations regarding the facemasks he sold, Romero made a total of $1,234,360.46 between March 16, 2020, through February 10, 2021.

The below table shows a breakdown of the sales Romero made:

| Start Date | End Date | "N95" masks sold | Total value |
|---|---|---|---|
| March 16, 2020 | February 10, 2021 | 12785 | $1,234,360.46 |

Charged wire transaction

On March 21, 2020, a Coast Guard attorney in Seattle, Washington, A.S., ordered two facemasks from Romero through the Trend Deploy website. The masks were advertised as, "N95 PM2.5 Anti-Virus Micro Particle Barrier Face Mask (Reusable with Activated Carbon Filter)."

---

[3] Other false representations Romero made about his facemasks were about the manufacturers. Romero claimed the facemasks were manufactured in the United States, despite his primary wholesalers being G.B. and A.C., which are both companies located in China. At least one customer was told, "[W]e are a US based company located in Ocala FL. We're currently mass producing class N95 masks." Romero told another customer that a specific mask that was advertised on his website was manufactured and shipped from the United States. Many customers complained after they received their masks and learned from the shipping labels that the masks were sent from China. Customers were fearful of buying respiratory products from China because the first human cases of the COVID-19 virus occurred in Wuhan, People's Republic of China.

Defendant's Initials ___fr___          32

A.S. needed the facemasks because she was dealing with COVID-19 outbreaks on cruise ships.  A.S. was also about to relocate to Washington D.C. for work, and she wanted N95 facemasks for protection during her cross-country move.

A.S. paid Trend Deploy $59.98 for the facemasks.  A.S. used her Bank of America credit card ending in 1774 to complete the transaction.  Bank of America credit cards are issued through FIA Card Services, National Association ("FIA"), which is a subsidiary of Bank of America located in Wilmington, Delaware.  Because A.S. initiated an electronic wire transfer of funds from Delaware to Trend Deploy in the Middle District of Florida, her transaction affected interstate commerce.

After placing the order, A.S. searched the facemask information from the NIOSH certificate she found on Trend Deploy's website.  She did not see the facemask information listed as N95.  A.S. emailed the NIOSH certificate from the Trend Deploy website to Romero through the Trend Deploy email address stating:

> *Hi Trend Deploy:*
>
> *I placed the below order and then saw several folks commenting that the N95 verification was fraudulent based on your posted info (attached below).*
>
> *I checked the NIOSH list and do not see where your product is on the list.*

Defendant's Initials ___fr___                33

*If you made an error on your post with the representation of certification, please cancel my order.*

*If you stand by the representation of certification, please include the accurate verification with my order.*

A.S. then received a response from Trend Deploy, stating:

*Since we're retailers, we do not require a certification of such. The N95 Certificate you're referring to was provided to us by our manufactures and comes with the NPPTL telephone number for verification purposes. I hope this helps.*

A.S. responded:

*If the Manufacturer has the certification then great. Who is the manufacturer? Obviously resell of fraudulently marketed products would be ill advised and illegal so I'm sure by now you inquired. Like everyone else, just worried about COVID scams (which seem to be plentiful).*

A.S. received a response from Trend Deploy, stating:

*Our certified masks have been selling since before this tragedy started. We can assure you the products we sell are legitimate.*

On April 5, 2020, A.S. received two facemasks from Trend Deploy. The facemasks were made of cloth, and they did not have any N95 labeling on them. She emailed Romero through the Trend Deploy website asking for a refund because the masks were not N95. She never received a response from Trend Deploy. She never received a refund from Trend Deploy.

Defendant's Initials ___fr___          34

The above is merely a summary of some of the events, some of the persons involved, and other information relating to this case. It does not include, nor is it intended to include, all the events, persons involved, or other information relating to this case.

Defendant's Initials ___fr___                35